# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00656-COA

**CHERYL EATON**                                                          **APPELLANT**

**v.**

**JAMES DEXTER HANEY AND KATHRYN**                          **APPELLEES**
**MARI HANEY**

DATE OF JUDGMENT:              06/09/2022
TRIAL JUDGE:                  HON. VICKI B. DANIELS
COURT FROM WHICH APPEALED:    DESOTO COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       LESLIE B. SHUMAKE JR.
ATTORNEY FOR APPELLEES:       BARRY W. BRIDGFORTH JR.
NATURE OF THE CASE:           CIVIL - CONTRACT
DISPOSITION:                  AFFIRMED - 04/02/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     Cheryl Eaton appeals from the DeSoto County Chancery Court's order (1) requiring specific performance of a contract she had with Kathryn and James Dexter Haney for the sale of real property and (2) awarding damages and attorney's fees in favor of the Haneys. Eaton challenges the court's finding that an enforceable written contract existed between the parties for the sale of Eaton's property. She also takes issue with the evidentiary basis for the award of damages and the legal basis for the award of attorney's fees. Finding no error, we affirm.

## PROCEDURAL HISTORY

¶2.     On May 1, 2017, Eaton and the Haneys entered into a written agreement for the purchase of Eaton's property on Wallace Lane in the town of Walls, Mississippi. The terms

of the signed writing specifically included that the agreement was for "a land purchase with dwellings on it" and that the agreement was for a "FIXED TERM" of "50 months" with payments for the purchase "to begin on the 5 day of May, 2017 and end on the 5 day of July 2021." Despite the completion of these payments and an additional amount, Eaton conveyed the Wallace Lane property to her niece Amber Longo by a quitclaim deed on October 11, 2021. Longo then filed an eviction action against the Haneys in the DeSoto County Justice Court on November 5, 2021.

¶3.    On November 17, 2021, the Haneys filed a complaint to enforce the contract and for other relief in the DeSoto County Chancery Court. The Haneys alleged that Eaton breached their contract and that Longo tortiously interfered with the contract. The Haneys sought specific performance of the contract, an award of monetary damages, and an order setting aside Eaton's quitclaim deed to Longo. The justice court transferred the eviction action between Longo and the Haneys to the chancery court on December 3, 2021. Eaton filed her answer to the complaint on December 20, 2021, denying all allegations and asserting affirmative defenses.

¶4.    On January 7, 2022, the Haneys filed a motion for a default judgment against Longo. Then on January 12, 2022, the chancery court entered a default judgment against Longo as to liability, set aside the quitclaim deed from Eaton to Longo, and reserved ruling on the matter of damages. The Haneys filed a motion for a temporary restraining order against Eaton on April 5, 2022, and the following day, Eaton responded by filing a motion for a temporary

2

restraining order against the Haneys. On April 13, 2022, the chancery court granted the Haneys a temporary restraining order and preliminary injunction against Eaton.

¶5.     A trial on the Haneys' complaint was held on June 8, 2022, and the chancery court entered a judgment on the next day. The court found in favor of the Haneys and ordered Eaton to execute a warranty deed conveying title to Dexter and Kathryn. The chancery court awarded the Haneys $36,911.59 in damages against Eaton and Longo, jointly and severally. Eaton appealed from the court's judgment on June 29, 2022.

## STATEMENT OF THE FACTS

¶6.     Eaton originally purchased the property on Wallace Lane through an owner-financed deed of trust in June 2009 for $75,000.00. At that time, her monthly payments were $731.89 for a term of one-hundred forty-three months, with the final payment being due in June 2021. In 2017, Eaton and the Haneys came to an oral agreement for the Haneys to pay Eaton $732.00 a month for fifty months in exchange for ownership of the Wallace Lane property. Eaton determined the payment amount and fixed monthly term, which represented a nearly mirror image of the remainder of her mortgage on the property.[1]

¶7.     On April 22, 2017, Kathryn made a Facebook post that read in part, "I want to take a minute and say a huge thank you to Sherry Eaton. . . . Dexter and I will begin the next chapter of our life together in a home that will be ours in just four years. Sherry, I cannot

---

[1] At the time of the agreement, Kathryn and Dexter had been renting a house in Olive Branch, Mississippi, and were five months into a year-long lease.

even begin to tell you how grateful I am that you asked us for this amazing opportunity. . . . That house looks amazing after the cleaning crew came in. . . . " Eaton responded to the post with a comment that said, "I love you, honey, and I'm praying for you and Dexter to have a wonderful, blessed life together."

¶8.    Kathryn found an online contract titled "Residential Tenancies Rental Agreement" that was used to formalize the agreement, and it was specifically edited to demonstrate the parties' intent to buy and sell the property according to the terms orally agreed to by Eaton and the Haneys. The Agreement provided certain statements, such as: "**This is a land purchase with dwellings on it. The land is 2 acres with one mobile home and one shop**"; and "**Being sold as is. Any repairs are to be done by tenants**." (Emphasis added). The Agreement was dated May 1, 2017, and contained a signature for each of the three parties. Dexter testified that he gave Kathryn authority to sign his name because he was not available. Kathryn testified that Eaton came by her place of employment and signed the agreement in her presence. The Haneys moved into a house on the property on May 5, 2017, and the fifty-month term of the agreement was set to end on July 5, 2021.

¶9.    Thereafter, Kathryn and Dexter made multiple improvements to the property at their own expense. The renovations included repairing the kitchen floor, repairing the hallway, installing new flooring, repairing the underpinning, installing a new garage door, installing a new water heater, purchasing new appliances, cutting down trees (and generally cleaning up the property), renting a propane tank, building a chicken coop, and installing a new roof.

4

¶10. Eaton testified that she paid off her original mortgage early, in either May or June 2019. She testified that shortly thereafter, sometime in the summer of 2019, she decided she wanted to move back to the Wallace Lane property. Eaton did not make the Haneys aware of her decision at that time, though, and she waited until October 2021 to inform them.

¶11. In July 2021, Kathryn contacted Eaton to discuss conveying the property to them, since they had completed their obligations and payments as required in fulfillment of the Agreement. Eaton instead told Kathryn that she wanted more money—for back pay of the taxes and insurance she had paid—and to "recoup money from her bad financial decision." Eaton initially told Kathryn she wanted $25,000.00, but after negotiations, the parties reached a verbal agreement for an additional $15,000.00. The Haneys agreed to pay a new monthly total of $612.00 per month, beginning in July 2021.[2] They paid the new amount until October 2021. During this period, Kathryn and Dexter also paid Eaton's $100.00 insurance deductible in order to have the roof replaced in August 2021.

¶12. In September 2021, Eaton called Anita Rainey, a long-time friend and neighbor across the street from Wallace Lane. Rainey testified that Eaton told her, "My name is mud – it's going to be mud. Yes I'm a liar," and "I'd changed my mind. I'm actually going to be moving in. I'd had the place appraised." Eaton then informed Rainey that Wallace Lane had appraised for $92,000.00.

---

[2] The fifty months of $732 payments ended in June 2021; the new $612 monthly amount replaced the previous monthly payment.

¶13.    Subsequently, on October 11, 2021, Eaton prepared a quitclaim deed conveying the Wallace Lane property to Amber Longo, her niece, unbeknownst to the Haneys. Two days later, Eaton texted Dexter and told him, "I have decide[d] to move back[,] it is worth 3 [times] the amount I am asking for it from you guys[;] I will pay you back the money you have spent." Then, on October 15, 2021, Eaton filed the quitclaim deed conveying title to Longo.

¶14.    On October 22, 2021, Kathryn texted Eaton:

> Are you saying you aren't going to follow through with our agreement to buy the property? We have paid close to $40k which was paying the land off for you. Then you told us in July that you wanted $15,000 more than we agreed to do that at $500 a month. I'm not understanding why you aren't following through with your commitment like we have over the years.

Kathryn followed up with the following message:

> Certainly you aren't trying to say you want us to leave the land we purchased from you? . . . After we paid off the land and you failed to follow through with signing it over like originally discussed. We weren't renting the place we were buying it. That's what you told us and signed into from the very beginning.

Eaton responded with a message that read in part:

> I was not in the right frame of mind. Who would pay 8.5 years on a property and then just let it go. I purchased the property and financed so it would be paid off by the time I was 60. . . . I should never have left in the first place. . . . this is the first time I have not been good for my word/handshake. I have to look out for me, no one else ever has nor ever will. It has nothing to do with friendship. This is a business decision.

¶15.    On November 13, 2021, as a result of the eviction action Longo filed against them, Dexter and Kathryn signed a new rental agreement and moved into a home in Hernando,

6

Mississippi, where their monthly payment was $1,500. Although the Haneys did not officially relinquish possession of the Wallace Lane property, Longo moved in for a time after they vacated it due to the eviction proceedings. She moved back out shortly after, and the property remained vacant during the pendency of this lawsuit.

**STANDARD OF REVIEW**

¶16.    This Court employs "a limited standard of review in appeals from . . . chancery court[s]." *Bond v. Bond*, 271 So. 3d 548, 550 (¶4) (Miss. Ct. App. 2018) (quoting *Corp. Mgmt. Inc. v. Greene County*, 23 So.3d 454, 459 (¶11) (Miss. 2009)). We "will not disturb a chancery court's factual findings 'when supported by substantial evidence unless the court abused its discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard.'" *Id*. (quoting *Biglane v. Under The Hill Corp.*, 949 So. 2d 9, 13-14 (¶17) (Miss. 2007)).

**DISCUSSION**

**I.    Valid Contract for the Sale of Real Property**

¶17.    Eaton's first claim on appeal is that the chancellor erred in finding that there was a signed contract between the parties for the sale of the real property. In her appellate brief she specifically states, "Cheryl feels aggrieved by the finding that the document was signed by her[.]" She further asserts, "The Court in [its] Judgment erroneously found the document produced to be valid . . . despite absolutely no evidence that Cheryl signed the document other than the testimony of Kathryn." Eaton incorporates two references to citations in her

7

argument as follows:

> Section 15-3-1 of the Miss[issippi] Code Annotated states that certain contracts or agreements . . . must be in writing to be enforceable. These are: (c) upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one year; [and] (d) upon any agreement which is not to be performed within the space of fifteen months from the making thereof[.]

> Also, [section] 75-2A-201. Statute Of Frauds (Miss[issippi] Code Annot[ated]. 2023 Edition) states that a lease contract is not enforceable by way of action or defense unless: (b) There is a writing, signed by the party against whom enforcement is sought . . . sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term.[3]

¶18.     Eaton argues that the signed written document the Haneys produced was not a valid contract, but she fails to cite any relevant legal authority beyond recitation of the statute to *support* her position. "The Mississippi Supreme Court has held that it is the duty of the appellant to provide authority in support of an assignment of error." *Greer v. Greer*, 312 So. 3d 414, 415 (¶9) (Miss. Ct. App. 2021) (quoting *Herrin v. Perkins*, 282 So. 3d 727, 732 (¶21) (Miss. Ct. App. 2019)). "Any failure to cite authority in support of an argument precludes consideration of the issue on appeal." *Id.* Regardless, a simple review of the evidence supporting the written contract here includes a clear intent to convey or sell real property, a clear description of the price or payment in consideration for the sale, and a description of the specific property to be sold. *See Swartzfager v. Saul*, 213 So. 3d 55, 63-64 (¶¶20-25)

---

[3] Eaton states in her brief, "Even though this section covers goods leased, it lends further credence to Cheryl's position," as well as, "By making the finding that the internet contract, not signed by James or Cheryl, the Court essentially overcame the Statute of Frauds problem that would have arisen had there not been a document in writing."

(Miss. 2017) (finding a valid, enforceable contract where the appellant alleged the agreement did not comply with the Statute of Frauds and had complained of the sufficiency of the contract terms describing and specifying the purchase price).

¶19. The dissent takes issue with the chancery court's finding on the basis of longstanding contract principles. The principles outlined by the separate opinion are presented in the context of interpreting the terms of the document as a contract for the sale of property. However, it is important to note that Eaton's challenge on appeal does not allege that the specific contract terms were somehow insufficient. Instead, she asserts that the entire printed document the Haneys produced is invalid because it contains a forgery of her signature. As the dissent notes, to refute the Haneys' claim for specific performance, Eaton testified that there was no written agreement, she did not sign the document, and she had never seen the document. The argument Eaton raises pertains to matters solely within the chancery court's discretion. Accordingly, under our limited standard of review, we do not find evidence that the chancellor committed manifest error by concluding that the document was not forged and that the document was a signed agreement between Eaton and the Haneys.

¶20. In sum, Eaton did not raise any claim (or attempt to assert any claim) contesting the actual terms within the document or arguing that the terms were an incorrect representation of their agreement. Instead, Eaton presented the chancellor with the question of whether the document contained her signature, i.e., was the document the contract and legal agreement between Eaton and the Haneys. She argues it was error for the chancellor to find that she

9

signed the document, but this argument is based on her contention that Kathryn's testimony contained timeline discrepancies that made it "impossible for the court to find that Cheryl signed this document." Eaton ultimately asks this Court to place more weight on her own testimony, maintaining she did not sign the produced document, never met Kathryn anywhere to sign anything, and had not seen the document before the lawsuit.

¶21. Whether the Haneys' and their witnesses' testimonies at trial were more or less reliable than Eaton's and her witnesses' testimonies was for the chancery court to determine in its role as the finder of fact. "[W]e recognize that a chancellor, being the only one to hear the testimony of witnesses and observe their demeanor, is in the best position to judge their credibility." *Legacy Hall of Fame Inc. v. Transp. Trailer Serv. Inc.*, 139 So. 3d 105, 109 (¶21) (Miss. Ct. App. 2014) (quoting *In re Est. of Carter*, 912 So. 2d 138, 143 (¶18) (Miss. 2005)). "Courts of review are not to undermine trial court authority by replacing the judgment with its own." *Green v. Green*, 349 So. 3d 1187, 1200 (¶48) (Miss. Ct. App. 2022) (quoting *Miller v. Miller*, 838 So. 2d 295, 297 (¶4) (Miss Ct. App. 2002)). Ultimately, the chancellor found the testimony and evidence presented by the Haneys to be more credible, and the finding is not for this Court to re-weigh.

¶22. Eaton also asserts a weight-of-the-evidence claim based on her assertion that "the findings by the court don't take into account two common sense arguments." Specifically, she contends, "First, no one would agree to deed over to renters a home that was worth $78,000.00 back in 2009 for $36,300.00 in 2021." And "[s]econdly, the internet document

10

allegedly prepared by Kathryn in 2017 was not, at any time prior to 2021, mentioned by her to anyone at any time until 2021." "This Court gives deference to a chancellor's findings in regard to witness testimony . . . because the chancellor is able to observe and 'personally evaluate the witnesses' testimony and the parties' behavior.'" *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) (quoting *Gable v. Gable*, 846 So. 2d 296, 299 (¶12) (Miss. Ct. App. 2003)). Therefore, Eaton's claim that the document was not a valid contract is also without merit on appeal.

## II.     Award of Damages and Attorney's Fees

¶23.    After hearing the testimony and receiving evidence, the chancellor entered a monetary damages award in favor of the Haneys. Eaton asserts that the chancery court erred by awarding damages to the Haneys without supporting facts or documentation other than Kathryn's testimony. Eaton argues that the residential lease agreement for the Haneys' new lease was admitted into evidence over her objection and that the alleged costs of repairs and renovations, deposits, moving expenses, and additional utility expenses had zero supporting documentation.

¶24.    First, Eaton's claim regarding the inclusion of damages for repairs and renovations is misguided. The record shows the chancery court's ruling did not award damages to the Haneys for the cost of repairs and renovations. Even though the Haneys' specific list of repairs and respective costs was admitted into evidence, the judgment did not include the list and instead totaled the exact amount of damages requested for the deposit and rent for the

11

new lease, moving expenses, and attorney's fees. Thus, this claim is without merit.

¶25. Second, in support of their damages claim, Kathryn offered documentation of the new residential lease agreement she and Dexter entered into for the house they moved into when Longo filed her eviction action against them. Eaton objected to this document on hearsay grounds at trial, but Kathryn properly authenticated the document as a signing party. The agreement specifically shows the monthly rental costs, the deposit fee, and the pet fees. The terms of the agreement provide the exact amount it cost the Haneys to reside at that new house upon moving after Longo's eviction action, and that amount supports damages of $19,500 for rent and $1,700 for deposits. In addition, the moving expenses the chancery court awarded were supported by Kathryn's testimony about the costs she and Dexter accrued. Kathryn's testimony also supports that the moving expenses were the result of Eaton's interference by conveying the property to Longo by a quitclaim deed, as well as Longo's interference by filing her eviction action against the Haneys. Kathryn had personal knowledge of the moving expenses and was subject to cross-examination as to any insufficiencies of proof regarding all the damages.

¶26. "When damages have occurred, mere uncertainty as to the amount does not preclude recovery . . . . 'All that can be required is that the evidence—with such certainty as the nature of the particular case may permit—lay a foundation which will enable the trier of fact to make a fair and reasonable estimate of the amount of damage.'" *Rolison v. Fryar*, 204 So. 3d 725, 741-42 (¶49) (Miss. 2016) (quoting *Cain v. Mid-South Pump Co.*, 458 So. 2d 1048,

12

1050 (Miss. 1984)). "[S]ufficient proof is that which is a reasonable basis for computation of damages and the best evidence obtainable under the circumstances of the case that will enable the trier of fact to arrive at a fair approximate estimate of the loss." *Progressive Cas. Ins. v. All Care Inc.*, 914 So. 2d 214, 221 (¶13) (Miss. Ct. App. 2005). Based on the circumstances of eviction being the cause of the moving expenses, we cannot find that the court abused its discretion in finding Kathryn's testimony was sufficient evidence of these damages.

¶27. Lastly, Eaton contests the award of attorney's fees to the Haneys. She argues that there was no testimony or finding that the Haneys were entitled to attorney's fees under the law. However, Eaton fails to cite legal authority to support her argument. "Our caselaw clearly provides that the failure to cite supporting legal authority precludes consideration of an issue on appeal." *Green*, 349 So. 3d at 1199-1200 (¶47) (quoting *Hardin v. Hardin*, 335 So. 3d 1088, 1094 (¶21) (Miss. Ct. App. 2022)). As such, her claim regarding attorney's fees is procedurally barred.

¶28. Notwithstanding the procedural bar, her claim is also without merit because Mississippi caselaw states, "[W]here a party's intentional misconduct causes the opposing party to expend time and money needlessly, then attorney's fees and expenses should be awarded to the wronged party." *Est. of McLemore v. McLemore*, 63 So. 3d 468, 487 (¶53) (Miss. 2011). There is ample proof in the record that Eaton admittedly acted in opposition to her agreement with the Haneys and intentionally chose to disregard their contract after

13

realizing the property was worth more money. Her intentional misconduct and actions contrary to their agreement and deeding the property to her niece are grounds that support the chancery court's award of attorney's fees to the Haneys.

**CONCLUSION**

¶29.    We find that Eaton failed to meet her burden under the standard of review on appeal and therefore affirm the chancellor's finding of a valid contract. We further find that the award of damages and attorney's fees to the Haneys was not reversible error. Therefore, we affirm the chancery court's judgment.

¶30.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR. EMFINGER, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**EMFINGER, J., DISSENTING:**

¶31.    The chancellor found the parties had "a valid contract" and "a binding agreement." The chancellor further found that the Haneys had relied upon Eaton's promise to their detriment. Based upon these findings, the chancellor ordered Eaton to convey the real property at issue to the Haneys and pay them monetary damages. The majority affirms the chancellor's decision. Because I find the award of specific performance in this case would render the Statute of Frauds meaningless, I respectfully dissent.

¶32.    At trial, Eaton readily admitted that she reneged on her *oral* agreement to sell the land to the Haneys. The Haneys attached to their complaint, and Kathryn Haney produced at trial,

14

a mostly pre-printed document titled "Residential Tenancies Rental Agreement,"[4] which Kathryn admits she found on the internet. She testified that she made certain typed additions to the form and that Eaton signed the document in her presence.[5] Eaton testified that there was no written agreement, that she did not sign the document produced by the Haneys, and that she had never seen the document before the Haneys filed their complaint. Thus, a question of fact was presented for the chancellor's resolution.

¶33.    In a bench ruling, the chancellor found that the parties had entered into a "binding agreement" for Eaton to sell the land to the Haneys. The chancellor, however, made no express finding that Eaton signed the document produced by the Haneys. Further, while the chancellor found there to be a valid contract and a binding agreement, the chancellor made no express finding that the document produced by the Haneys was a written contract for the sale of real property, was signed by Eaton, and was sufficient to satisfy the Statute of Frauds. Such a finding is necessary to grant specific performance.[6]

¶34.    In *SEL Business Services LLC v. Lord*, 367 So. 3d 147, 148 (¶1) (Miss. 2023), the Mississippi Supreme Court stated:

---

[4] The full document is attached hereto as an Appendix.

[5] The document is dated May 1, 2017, and Haney first testified that Eaton came to her office and signed the document on that day. However, on cross-examination, Haney admitted that she got married on May 1 in Memphis and had taken that day off work. Haney conceded that she may have gotten the date wrong.

[6] Neither the Haneys nor the chancellor in her order cite any authority for the grant of specific performance. There is no authority cited as to what proof must be produced at trial to support the award of specific performance.

15

And it is of course true that a contract for the sale of land that has not been reduced to writing is unenforceable. **So specific performance of the oral contract is not an available remedy.** But, contrary to Barriffe's suggestion, that does not mean that a would-be property purchaser—when he fails to reduce the sales contract to writing—never has any equitable recourse. Instead, long-standing Mississippi precedent has allowed equitable claims when contract-enforcement claims fail due to the statute of frauds. *E.g.*, *Powell v. Campbell*, 912 So. 2d 978, 981-82 (Miss. 2005); *Koval v. Koval*, 576 So. 2d 134, 138 (Miss. 1991); *PMZ Oil Co. v. Lucroy*, 449 So. 2d 201, 206 (Miss. 1984); *Dobbs v. Bowling*, 339 So. 2d 985, 986 (Miss. 1976).

(Emphasis added). And in *White v. White*, 325 So. 3d 666, 670-71 (¶13) (Miss. Ct. App. 2020), this Court reasoned:

"The principal purpose of the Statute of Frauds is to require the contracting parties to reduce to writing the specific terms of their contract, especially an agreement affecting lands for more than one year, and thus to avoid dependence on the imperfect memory of the contracting parties, after the passage of time, as to what they actually agreed to some time in the past." *Sharpsburg Farms Inc. v. Williams*, 363 So. 2d 1350, 1354 (Miss. 1978) (citation omitted). The law expressly bars actions based on unwritten agreements for the sale of land. Miss. Code Ann. § 15-3-1(c) (Rev. 2012) (**"An action shall not be brought whereby to charge a defendant or other party . . . upon any contract for the sale of lands" except when "the promise or agreement" is "in writing, and signed by the party to be charged" or his agent.**).

(Emphasis added). It is abundantly clear that there must be a written agreement to sell land— signed by the owner—before a court can order specific performance of that agreement. The absence of an express finding by the chancellor that Eaton signed the document produced by the Haneys and that the document was sufficient to satisfy the Statute of Frauds requires that the order granting specific performance be reversed.

¶35. Even if we assume, for the sake of argument, that the chancellor implicitly found that

16

Eaton signed the document produced by the Haneys, specific performance still would not be

an available remedy in this case.[7] In *White v. Cooke*, 4 So. 3d 330, 334 (¶14) (Miss. 2009),

the supreme court explained:

> For specific performance to be granted, a contract must be reasonably complete and reasonably definite on material terms. *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991) (citing *Duke v. Whatley*, 580 So. 2d 1267, 1272-74, (Miss. 1991)). "A contract is said to enjoy the level of specificity predicate to enforceability: if it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence." *Leach*, 586 So. 2d at 802 (quoting *Duke*, 580 So. 2d at 1274). **If the contract does not pass this test of specificity, it should be rendered unenforceable, and specific performance should be denied**. *Leach*, 586 So. 2d at 802 (citing *Duke*, 580 So. 2d at 1272-74).

(Emphasis added). Further, in *Marshall v. Lindsly*, 9 So. 3d 1174, 1178-79 (¶13) (Miss. Ct.

App. 2009), this Court discussed the interpretation of contracts:

> "The most basic principle of contract law is that contracts must be interpreted by objective, not subjective standards. **A court must effect a determination**

---

[7] The majority contends that Eaton did not raise the issue of the sufficiency of the document to satisfy the Statute of Frauds. However, Eaton pled the Statute of Frauds as an affirmative defense in her answer to the complaint. At trial, Eaton cross-examined Kathryn Haney, at length, about their agreement. Haney admitted that they "had an agreement that [they] were going to purchase this at the end of the lease." Haney was questioned about the fact that there was nothing in the rental agreement about an option to purchase. Haney admitted that there was nothing in writing about Eaton giving them a deed. In closing argument, Eaton's counsel referred to the fact that there is no language in the document to establish an option to purchase the property. Counsel argued that Eaton had agreed to sell the property to the Haneys if they could agree upon a price. Eaton's counsel also argued before the chancellor that this is the exact situation the Statute of Frauds "was designed to prevent." Finally, on appeal Eaton contends that "[t]here was never an instrument in writing as required by the Statute of Frauds to support the position of James and Kathryn that there was a 'rent to own' contract between the parties."

**of the meaning of the language used, not the ascertainment of some possible but unexpressed intent of the parties.**" *Dunlap Acres, Ltd. v. Intervest Dev. Corp.*, 955 So. 2d 345, 348 (¶13) (Miss. Ct. App. 2006) (citation omitted). The Mississippi Supreme Court has provided a three-tiered approach to be used in contract interpretation. *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 284 (¶13) (Miss. 2005). The reviewing court must first apply the "four corners" test, which looks to the language used by the parties in expressing their agreement. *Id*. If that does not give the court a clear understanding of the parties' intentions, the reviewing court should apply the discretionary "canons" of contract construction. *Id*. Finally, if the parties' intentions still remain unclear, the reviewing court should consider extrinsic or parol evidence. *Id*.

(Emphasis added). Also, in *Swartzfager v. Saul*, 213 So. 3d 55, 64 (¶25) (Miss. 2017), we were reminded:

A consistent rule of contract construction is that "when the terms of a contract are vague or ambiguous, they are always construed more strongly against the party preparing it." *Stampley v. Gilbert*, 332 So. 2d 61, 63 (Miss. 1976) (citing *Globe Music Corp. v. Johnson*, 226 Miss. 329, 84 So. 2d 509 (1956), and *Love Petroleum Co. v. Atlantic Oil Producing Co.*, 169 Miss. 259, 152 So. 829 (1934)).

¶36. The document in the case at hand appears to be a sample agreement related to a "Residential Tenancies Act" enacted by one of the Canadian Provinces or Territories. It is clear from the title of the document, and ninety-nine percent of its content, that this form was intended to be a rental agreement. There is no preprinted language, or added language, that indicates this is a "rent-to-own" or a "lease/purchase" or an "option to purchase" rental agreement. There is no legal description of the land to be conveyed. There is no mention of a closing date and no provision for the land to be conveyed by deed at any specific time in the future. There is no statement as to whether a warranty deed or a quitclaim deed will be

provided. There is no mention in the rental agreement of the existing deed of trust against the property or any requirement that it be paid in full before any conveyance.

¶37.  The parties are referred to throughout the rental agreement as "landlord" and "tenants." The parties are never referred to as "seller," or "buyers." While most of the pre-printed form is not altered, in Section 11 of the document, labeled "Notice of Termination," boxes are actually checked describing the notice required to be given by either the tenants or the landlord to terminate this "term tenancy." The tenants were allowed to give notice of termination of the agreement "not less than two months before the end of the term," and the landlord could give notice of termination of the rental agreement "not less than three months before the end of the term." If this document were intended to be a rent-to-own agreement, it seems unusual for the seller to be allowed to terminate the agreement after forty-seven months of a fifty-month term without providing any recourse for the buyers.

¶38.  There are two statements typed into inappropriate blanks of this rental agreement from which the Haneys argue that this is a contract for the sale of real property. The first statement is under block 2 that is labeled "Premises." In the portion of the form labeled "Superintendent or property manager (if different from the landlord)," the Haneys typed the following on the line that is provided for the name of the superintendent: "This is a land purchase with dwellings on it. The land is 2 acres with one mobile home and one shop." The second statement is in block 7 that is labeled "Services/Facilities." The statement in block 7 is under the statement: "The rent mentioned above includes provision of the following

19

services and facilities (check all that apply)." Under this statement, there are several services listed with none of the boxes checked and on a line beside the box for "Other(specify):" the Haneys typed in the following: "Being sold as is. Any repairs are to be done by tenants."

¶39.    While I recognize that there is authority that would allow for a missing term to an otherwise valid contract to be supplied by parol evidence, I find that the two lines relied upon by the Haneys, the chancellor, and the majority opinion cannot magically transform what is clearly a rental agreement into a contract for the sale of land that is sufficient to satisfy the Statute of Frauds. Accordingly, I would reverse the chancellor's grant of specific performance. However, I do find that Eaton had orally agreed to sell the land to the Haneys and that the Haneys had detrimentally relied upon their agreement. Therefore, I would remand the matter for the chancellor to consider such damages that may be appropriate pursuant to *SEL Business Services*.

## Residential Tenancies
## Rental Agreement

**Parties**

1. The Rental Agreement is made in duplicate between

Cheryl Eaton , the Landlord,
Name

Address                                                Postal Code          901-827-3227
                                                                            Telephone(s)

AND

James Dexter Haney
Name(s)

Kathryn Mari Haney , the Tenant(s), 901-907-8632
Name(s)                                              Telephone(s)

**Premises**

2. The Landlord will rent to the Tenant and the Tenant will rent from the Landlord the following residential premises:

7306 Wallace Lane
Street Name and Number                                    Apartment No.

Wails                                                     38680
City or Town                                             Postal Code

Is the residential premises a mobile home space?   Yes ☐   No ☒

Superintendent or property manager (if different from the landlord)

This is a land purchase with dwellings on it.. The land is 2 acres with one mobile home and one shop.
Name

Address                                          Postal Code        Telephone(s)

**Act**

3. 3. The "Act" as referenced in this agreement, shall mean the "Residential Tenancies Act".

**Term**

4. Select paragraph (a) or (b), NOT BOTH

☐ (a) MONTH TO MONTH
   WEEK TO WEEK
   This Agreement is to begin on the _____ day of _____, 20_____ and run from month to month☐ or from week to week☐.

☒ (b) FIXED TERM ( 50 MONTHS)
   This Agreement is to begin on the 5 day of May , 20 17

   and end on the 5 day of July , 20 21 .

**Rent**

5. The Tenant will pay rent at the following rate: $_____ per week☐ OR $ 732.00 per month ☒ OR $_____ per term ☐.

The first payment of rent is due on the 5 day of May , 20 17 and thereafter on the 5 day of each week☐ month ☒.

Unless otherwise agreed upon, the tenant shall ensure all rental payments are sent or delivered to the landlord or landlord's agent. Rent may also be paid by postdated cheques. (Where rent payable, in part or whole, is in other than money, the landlord shall give to the tenant a letter specifying the payment and placing a value on each item contained in the payment). **THE LANDLORD IS ENCOURAGED TO PROVIDE A RECEIPT TO THE TENANT FOR ANY RENT RECEIVED.**

**Rental Increase**

6. Rent may not be increased:
(a) during any rental agreement of a fixed term;
(b) where the residential premises are rented from week to week or month to month:
   (i) more than once in a 12 month period
   (ii) during the 12 months immediately following the commencement of the rental agreement;
(c) during the 12 months immediately following the commencement of the rental agreement for the fixed term where a rental agreement for a fixed term expires and the tenancy continues month to month.

A Landlord must give not less than eight weeks written notice of any rental increase where the residential premises are rented from week to week and not less than three months written notice where the residential premises are rented from month to month.

## Services/Facilities

**7** The rent mentioned above includes provision of the following services and facilities (check all that apply):

| | |
|---|---|
| ☐ Heat | ☐ Range |
| ☐ Water Supply | ☐ Water Tax |
| ☐ Telephone | ☐ Washer & Dryer (without charge) |
| ☐ Cable TV Hook-up apparatus | ☐ Grass Cutting |
| ☐ Snow Removal for Parking lot and Walkways | ☐ Parking for ____ vehicles |
| ☐ Janitorial Services for Common Areas | ☐ Furniture (attach complete listing) |
| ☐ Wood Stove | ☐ Electricity |
| ☐ Hot Water | ☐ Property Tax |
| ☐ Refrigerator | ☐ Washer & Dryer |
| ☐ Cable TV Service | ☒ Propane |

☐ Other (specify) _Being sold as is. Any repairs are to be done by tenants._

The following services are the responsibility of the tenant: (ie. electrical costs)

☐ None

☒ Other (specify) _All utilities will need to be put in Haney name._

## Other Occupants

**8** In addition to the Tenant, the following occupants may reside at the rented premises:

1. _____  4. _____
2. _____  5. _____
3. _____  6. _____

## Security Deposit

**9** Check only one of the following:

☒ A security deposit is not required OR

☐ The Landlord hereby acknowledges receipt of a security deposit of $_____ to be held in trust. (Section 12 of the Act)

## Limit of Security Deposit

**10** Money or other value as a security deposit shall not be in excess of:

(i) The first two weeks rent if premises rented week to week;

(ii) 3/4 of the first months rent if premises rented month to month;

(iii) 3/4 of the first months rent that would be payable if rent was proportioned to a monthly payment where the residential premises are rented for a fixed term of not less than six months and not more than 12 months. (Section 12 of the Act).

## Notice of Termination

**11** Notice to terminate the rental agreement shall be given for the following periods: (Notice must be in writing per Section 17 and method of service per Section 30 of the Act.)

| | BY THE TENANT (check one) | BY THE LANDLORD (check one) |
|---|---|---|
| Term Tenancy | ☒ Term Tenancy<br>Not less than two months before the end of the term | ☒ Term Tenancy<br>Not less than three months before the end of the term |
| Month to Month | ☐ Month to Month Tenancy<br>Not less than one month before the end of the rental period | ☐ Month to Month Tenancy<br>Not less than three months before the end of the rental period |
| Week to Week | ☐ Week to Week Tenancy<br>Not less than one week before the end of the rental period | ☐ Week to Week Tenancy<br>Not less than four weeks before the end of the rental period |
| Mobile Home Owned by Tenant | ☐ Mobile Home Space<br>Not less than one month before the end of the rental period | ☐ Mobile Home Space<br>Not less than six months before the end of the rental period |

## Statutory Conditions

**12** The following statutory conditions apply (Section 8 of the Act):

**1. Obligation of the landlord**

(a) the landlord shall maintain the premises in a good state of repair and fit for habitation during the tenancy and shall comply with a law respecting health, safety or housing.

(b) paragraph (a) applies regardless of whether when the landlord and tenant entered into the rental agreement the tenant had knowledge of a state of non-repair, unfitness for habitation or contravention of a law respecting health, safety or housing in the premises.

**2. Obligation of the tenant**

The tenant shall keep the premises clean, and shall repair damage caused by a wilful or negligent act of the tenant or of a person whom the tenant permits on the premises.

**3. Subletting Premises**

The tenant may assign, sublet or otherwise part with possession of the premises subject to the consent of the landlord and the landlord shall not arbitrarily or unreasonably withhold consent and shall not levy a charge in excess of expenses actually incurred by the landlord in relation to giving consent.

**4. Mitigation on Abandonment**

Where the tenant abandons the premises, the landlord shall mitigate damages that may be caused by the abandonment to the extent that a party to a contract is required by law to mitigate damages.

**5. Entry of Premises**

Except in the case of an emergency, the landlord shall not enter the premises without the consent of the tenant unless

(a) notice of termination of the rental agreement has been given and the entry is at a reasonable time for the purpose of exhibiting the premises to a prospective tenant or purchaser and a reasonable effort has been made to give the tenant at least four hours notice;

(b) the entry is made at a reasonable time and written notice of the time of entry has been given to the tenant at least twenty-four hours in advance of the entry;

(c) the tenant has abandoned the premises under Section 27.

**6. Entry Doors**

Except by mutual consent, neither the landlord nor the tenant shall, during the use or occupancy of the premises by the tenant, alter a lock or locking system on a door that gives entry to the premises.

**7. Peaceful Enjoyment**

(a) The tenant shall not unreasonably interfere with the rights of the landlord or other tenants in the premises, a common area or the property of which they form a part.

(b) The landlord shall not unreasonably interfere with the tenant's peaceful enjoyment of the premises, a common area or the property of which they form a part.

**8. Disconnection of Services**

(a) A landlord or tenant shall not, without the written consent of the other party to the rental agreement, disconnect or cause to be disconnected, heat, water or electric power services being provided to the premises.

(b) Where a landlord and tenant enter into a written rental agreement, the conditions set out in Subsection (1) shall be reproduced in the agreement without variation or modification.

## Use

**13** The tenant shall use the residential premises for residential purposes only and will not carry on, or permit to be carried on in the residential premises, any trade or business without the written consent of the landlord.

## Reasonable Rules and Regulations

**14** The tenant promises to comply with any rules concerning the tenant's use or occupancy of the residential premises or building or use of services and facilities provided by the landlord provided that the rules are in writing, are reasonable in all circumstances and the tenant is given a copy of the rules at the time of entering into the rental agreement and is given a copy of any amendments.

## Tenant Copy of Agreement

**15** A duplicate copy of this signed agreement shall be delivered to the tenant by the landlord within 10 days after the signing of this agreement. The landlord shall advise the tenant in writing of any change of ownership of the residential premises in accordance with Section 5 of the Act.

## Rental Arrears

**16** In a month to month or term tenancy where the rent is in arrears for 15 days, the landlord may give to the tenant notice that the rental agreement is terminated and that the tenant is required to vacate the residential premises residential premises not less than 10 days after the notice is served. (Section 18(1) of the Act). In a week to week tenancy where the rent is in arrears for 3 days the landlord may give to the tenant notice to terminate the residential premises not less than 3 days after the notice is served (Section 18(1) of the Act).

When all arrears of rent are paid in full by the tenant before the termination date on a notice to terminate given for rental arrears, this notice to terminate is void and of no effect. This does not apply where notice to terminate is given more than twice in a 12 month period. (Section 18(2) of the Act).

## Binding Effect and Interpretation

**17** This rental agreement is for the benefit of the landlord and the tenant and is binding on the tenant, the tenant's heirs, executors, administrators, and assigns the landlord and the landlord's heirs, executors, administrators assigns, and successors in title. This agreement is to be interpreted and executed with direct reference to the *Residential Tenancies Act* and in conjunction with any landlord's rules and regulations as may be attached hereto. Any term or condition added to this agreement that contravenes any of the provisions of the *Residential Tenancies Act* is void and has no effect.

23

**Additional Obligation**

18   The tenant promises to comply with any additional obligations set out below.
Maintain the property.

**Signing of Rental Agreement**

19   Sign both copies separately (Do not use carbon for signature)

| Landlord's Signature | Landlord's Signature | Date |
|---|---|---|
| _amy Eaton_ | | 5·1·17 |

| Tenant's Signature | Tenant's Signature |
|---|---|
| _Kathryn Haney_ | |

| Tenant's Signature | Date |
|---|---|
| _James Haney_ | 5/1/17 |

| Witness (Optional) | Date |
|---|---|
| | |

**Signing of Rental Agreement**

20   I have received a copy of the *Residential Tenancies Act*

| Tenant's Signature | Tenant's Signature | Date |
|---|---|---|
| | | |

**Copy of Agreement**

21   I have received a duplicate copy of this agreement

| Tenant's Signature | Tenant's Signature | Date |
|---|---|---|
| | | |

**DISCLAIMER CLAUSE**

This sample Residential Tenancies Agreement, is a guideline for the benefit of landlords and tenants. This sample agreement, therefore, is not intended to be exhaustive and may not include provisions relating to all circumstances particular to the contractual relations between a landlord and a tenant. The Government does not accept responsibility for any losses incurred under this model agreement or arising from the contractual relationship of a landlord or tenant. Any reliance upon this sample agreement is at your own risk.